OPINION OF THE COURT
BARTO, Senior Judge:*
A court-martial composed of officers and enlisted members convicted appellant, contrary to his pleas, of premeditated murder, larceny (three specifications), and willfully discharging a firearm under such circumstances as to endanger human life in violation of Articles 118, 121, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 921, and 934 [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a dishonorable discharge, confinement for life without eligibility for parole, forfeiture of all pay and allowances, and reduction to Private El.
This case is before the court for review under Article 66(c), UCMJ, 10 U.S.C. § 866(c). We find that the military judge erred when he declined to instruct the members on the special defense of accident as requested by trial defense counsel. We further find that the military judge erred when he failed to sua sponte instruct the members on the lesser included offenses of attempted premeditated murder, attempted intentional murder, and attempted voluntary manslaughter. We will grant appropriate relief in our decretal paragraph.
Facts
On 2 May 2000, appellant gave a sworn statement to investigators from the Criminal Investigation Command in which he admitted shooting Specialist (SPC) JK. Specifically, appellant told Special Agent (SA) Michael Steward that he shot SPC JK accidentally while the two of them were target shooting at a remote area on Fort Lewis, Washington. After asserting that he and the victim “were always safe when shooting,” appellant went on to provide—in relevant part—the following information in the question and answer portion of his interview:
Q: Was it an accident?
A: Yes.
Q: How did it happen? What kind of weapon?
A: Mine.
Q: Where?
A: There were washing machines and dryers. There was an old car battery and we were shooting [a] can. And I don’t know what happened. I think he lost count of how many rounds, I was just about to shoot my third shot, I kept missing the can, and he just walked down. I was just saying Oh Crunchy,[1] can you hear me. He wasn’t responding. I wanted to just drive away but I was scared. I could tell he was suffering. I had no more ammo so I grabbed his gun and shot him like two more times. The blood was coming out around his neck. The other shots were in his head. I knew if I put him in the truck he was going to die. I was afraid they were not going to believe me.
Q: Did you put the weapon right next to his head?
A: No. I backed up some. I closed my eyes. I did not see if I hit him. His tongue and eyes stopped moving.
Q: Describe how you first shot him[.]
A: He was standing up. We were against his truck. I remember I was looking through the sights. I took a breath and shot and he fell.
Q: How far was he from you?
A: [Fjifteen or twenty feet.
Q: Where was he?
A: He was standing beside me when I fired. He must have moved down range.
*733 Q: Were your eyes open on the first shot that hit him?
A: Yes[,] one eye was open.
Q: Then you saw him?
A: No.
Q: Do you think if you had not fired the other rounds he might have lived?
A: He might have. But the blood was coming out so fast.
Special Agent Steward concluded his questioning of appellant as follows:
Q: Then why the other shots?
A: I was scared. I was freaking out. I didn’t want him to suffer.
Q: Did he ask [you] to shoot him, after the first one?
A: No. He said nothing.
Q: Were you wearing your glasses?
A: Yes.
Q: Were you screwing around?
A: I didn’t mean to shoot him. I don’t know if he jumped or what, but I did not see him.
Q: Did you mean to kill him, to finish him off, when you fired the second shots?
A: Yes. I didn’t want him to suffer.
The military judge admitted this written statement into evidence.
Appellant made a second statement to investigators later the same night during a videotaped interview at the scene of the shooting. In this statement, appellant reiterated his assertion that the first shot that hit SPC JK was an accidental shot. Appellant also advanced the theory that the first shot might have resulted from a bullet that ricocheted from the washer or dryer at which they were shooting. The military judge admitted the videotaped statement into evidence.
Doctor (Dr.) Daniel Selove, a forensic pathologist, conducted an autopsy on the body of SPC JK and testified at trial as to his observations and conclusions concerning SPC JK’s death. Doctor Selove opined that the first bullet that hit SPC JK entered at the back of the neck, passed through the spinal cord and the air passages at the back of the nose and throat, and exited through the nose. Doctor Selove observed that the wound was fatal. He explained,
[T]he injury to the spinal cord at that site would simultaneously cause a fatal shock, so to speak, of ... vital breathing and heart centers. Breathing may continue, heart rate may continue in a fading fashion for some seconds or minutes, but in any case, the fatal injury occurs when the bullet passed through that site.
On a related note, Dr. Selove said the movement of the eyes and mouth are controlled “higher in the brain than the injury site.” As such, “[r]eflexive type movement, uncontrolled or spasmodic movement may potentially occur in such a wound. It would not be voluntary movement and it may or may not be present.”[2]
Citing two bases for his decision, the military judge denied trial defense counsel’s request for an instruction concerning the special defense of accident. First, the military judge asserted, “[t]his certainly was a negligent act it seems, even your own client says that in his so-called confession.” When trial defense counsel responded that appellant “says he was aiming at the target, he wasn’t fooling around or aiming at [SPC JK],” the military judge stated, “[w]ell, I’ll take judicial notice that soldiers are not allowed to go out in the back forty and shoot off rounds.”
While the military judge declined to give the requested instruction on the special defense of accident, he did instruct the members on the lesser included offenses of intentional murder, voluntary manslaughter, involuntary manslaughter, and negligent homicide. The defense did not request, and the military judge did not give, instructions to the members concerning the lesser included offenses of attempted premeditated murder, attempted intentional murder, or attempted voluntary manslaughter.
*734 Law

Instructions

“‘The question of whether a jury was properly instructed [is] a question of law, and thus, review is de novo.’ ” United States v. Maxwell, 45 M.J. 406, 424 (C.A.A.F.1996) (quoting United States v. Snow, 82 F.3d 935, 938-39 (10th Cir.1996)). “The military judge bears the primary responsibility for ensuring that mandatory instructions ... are given and given accurately.” United States v. Miller, 58 M.J. 266, 270 (C.A.A.F.2003); R.C.M. 920(a). Pursuant to R.C.M. 920(a) discussion:
Instructions consist of a statement of the issues in the case and an explanation of the legal standards and procedural requirements by which the members will determine findings. Instructions should be tailored to fit the circumstances of the case, and should fairly and adequately cover the issues presented.
Required instructions on findings include “[a] description of the elements of each lesser included offense in issue” and “[a] description of any special defense under R.C.M. 916 in issue.” R.C.M. 920(e) (emphasis added). “A matter is ‘in issue’ when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose.” R.C.M. 920(e) discussion. If there is any doubt as to whether a lesser included offense or special defense is in issue, the doubt shall be resolved in favor of appellant. United States v. Davis, 53 M.J. 202, 205 (C.A.A.F.2000) (citing United States v. Steinruck, 11 M.J. 322, 324 (C.M.A.1981)).
Further, although R.C.M. 920(f) provides that “[f]ailure to object to an instruction or to omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error,” our superior court held this rule of waiver “does not apply to required instructions.” Davis, 53 M.J. at 205.

Accident

Pursuant to R.C.M. 916(f), “[a] death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable.” If the special defense of accident is reasonably raised by the evidence, the military judge has an affirmative duty to instruct the members on the defense. Davis, 52 M.J. at 205 (C.A.A.F.2000) (citing United States v. Watford, 32 M.J. 176, 178 (C.M.A.1991)). The defense of accident has three elements:
First, evidence must be introduced that the accused was engaged in an act not prohibited by law, regulation, or order. Second, this lawful act must be shown by some evidence to have been performed in a lawful manner, i.e., with due care and without simple negligence. Third, there must be some evidence in the record of trial that this act was done without any unlawful intent.
United States v. VanSyoc, 36 M.J. 461, 464 (C.M.A.1993) (citing United States v. Ferguson, 15 M.J. 12, 17 (C.M.A.1983)). The military judge must instruct the members concerning the defense if the record contains “some evidence on each of these elements.” United States v. Jenkins, 59 M.J. 893, 898 (Army Ct.Crim.App.2004) (quoting Ferguson, 15 M.J. at 17). The accused’s statements, without any additional evidence, may be sufficient to require an instruction on a special defense. Ferguson, 15 M.J. at 17 (citing United States v. Tucker, 17 U.S.C.M.A. 551, 554, 38 C.M.R. 349, 352, 1968 WL 5418 (1968)); see United States v. Moore, 16 U.S.C.M.A. 375, 377-78, 36 C.M.R. 531, 534-35, 1966 WL 4525 (1966).

Lesser Included Offenses

In accordance with Article 79, UCMJ, 10 U.S.C. § 879, “[a]n accused may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein.” “To constitute an attempt there must be a specific intent to commit the offense accompanied by an overt act which directly tends to accomplish the unlawful purpose.” Manual for Courts-Martial, United States (2000 ed.), Part IV, para. 4c(l). Concerning instructions on lesser included offenses, our superior court stated:
*735 An accused is entitled to have a court-martial consider all reasonable alternatives to guilt. Toward this end, as long as an accused can show “some evidence” that “reasonably raises” the applicability of a lesser included offense, the military judge must instruct the panel on that lesser included offense. Evidence “reasonably raises” a lesser included offense if it could cause members to “attach credit” or rely upon it if they so choose.
United States v. Bean, 62 M.J. 264, 266 (C.A.A.F.2005) (internal citations omitted). “Instructions on lesser-included offenses are required unless affirmatively waived by the defense.” Davis, 53 M.J. at 205 (citing United States v. Strachan, 35 M.J. 362, 364 (C.M.A.1992)).
Discussion
We conclude that appellant’s statements raise the special defense of accident. As a threshold matter, we decline to be bound by the military judge’s “judicial notice that soldiers are not allowed to go out in the back forty and shoot off rounds.” The military judge did not identify the source for this determination, and there is no evidence in the record of any statute or regulation that prohibited appellant from possessing and using a pistol for target shooting in the area in which SPC JK was killed. Moreover, this court was unable to identify any similar provision in federal, state, local, or military law that prohibits recreational shooting and is applicable to the instant facts. The military judge should have attached a copy of the applicable law, if such exists, to the record of trial to facilitate appellate review. See Military Rule of Evidence 201A analysis at A225. In the absence of any evidence presented at trial or valid judicial notice of domestic law, we cannot conclude that appellant’s conduct in possessing and using a firearm for target shooting was per se unlawful under the circumstances of this case.
Further, there was some evidence that appellant was target shooting in a lawful manner. Appellant asserted that he and SPC JK “were always safe when shooting,” and that the initial injury to SPC JK was an accident.[3] In his written statement, appellant said that he was standing next to SPC JK, looking through the sights while shooting with at least one eye open, when SPC JK “must have moved down range” into his line of fire. Appellant denied seeing SPC JK in his field of vision when he fired the first shot that struck SPC JK. In light of these facts, and contrary to the determination of the military judge,[4] we find some evidence in the record that appellant was target shooting in a lawful, non-negligent manner.
There is also some evidence in the record that appellant did not initially intend to shoot SPC JK or cause him injury. The record reflects that appellant told SA Steward that he was shooting at a can when a bullet from his pistol struck SPC JK. Appellant also expressly asserted in his written statement, “I didn’t mean to shoot him.” We are therefore satisfied that there is some evidence “this act was done without any unlawful intent” and the resulting injury was unintended and unexpected. See Ferguson, 15 M.J. at 17; United States v. Curry, 38 M.J. 77, 80 n. 4 (C.M.A.1993); R.C.M. 916(f). Given that there is some evidence on the record concerning each element of the defense, we conclude that the military judge erred by failing *736 to instruct the members on accident as required by R.C.M. 920(e).
We must now turn to the military judge’s failure to provide instructions concerning the lesser included offenses raised by the evidence. Appellant told SA Steward that he was “scared” and “freaking out” after he realized that SPC JK was shot, thereby placing the offense of voluntary manslaughter at issue. The testimony of Dr. Selove concerning the speed with which SPC JK may have died placed the offenses of attempted voluntary manslaughter and attempted murder at issue. If SPC JK died “in seconds” after being shot in the head the first time by appellant, it is possible that SPC JK was dead by the time appellant fired the second and third shots—notwithstanding SPC JK’s tongue and eye movements. Appellant’s written statement mentions several actions that would have inevitably prolonged the interval between the first shot and the following shots. Specifically, before firing the second and third shots, appellant attempted to speak to SPC JK and observed that he was bleeding and his tongue and eyes were moving. Appellant reasoned that he could not transport SPC JK to a medical facility because of the nature of the wound. He then discovered that the magazine to his pistol was empty and he located SPC JK’s pistol.
The military judge apparently overlooked the very real possibility that SPC JK was already dead when appellant fired the second and third shots. Given that trial defense counsel did not affirmatively waive instructions concerning attempted premeditated murder, attempted intentional murder, or attempted voluntary manslaughter, we must conclude that the military judge erred by failing to instruct the members on these offenses. See Davis, 53 MJ. at 205.
“Once it is determined that a specific instruction is required but not given, the test for determining whether this constitutional error was harmless is whether it appears ‘beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.’ ” United States v. McDonald, 57 M.J. 18, 20 (C.A.A.F.2002) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In our assessment, the evidence in this ease was ejctremely complicated and raised several instructional possibilities:
(1) Accidental homicide followed by attempted voluntary manslaughter—appellant accidentally shot and killed SPC JK, and then, while in the heat of sudden passion caused by the shooting, appellant intentionally fired twice at SPC JK’s corpse under the mistaken belief that SPC JK was still alive because appellant “did not want him to suffer;”
(2) Accidental homicide followed by attempted intentional murder—appellant accidentally shot and killed SPC JK and then intentionally fired two shots at SPC JK’s corpse under the mistaken belief that SPC JK was still alive and because appellant “did not want him to suffer;”
(3) Accidental homicide followed by attempted premeditated murder—appellant accidentally shot and killed SPC JK, and then intentionally fired two shots at SPC JK’s corpse with the premeditated design to kill SPC JK under the mistaken belief that SPC JK was still alive and appellant “did not want him to suffer;”
(4) Negligent homicide or involuntary manslaughter followed by attempted murder or manslaughter—appellant shot and killed SPC JK with either simple or culpable negligence and then proceeded as described in paragraphs (1), (2), or (3) above;
(5) Voluntary manslaughter—appellant accidentally or negligently shot and wounded SPC JK, and then, while in the heat of sudden passion caused by the shooting, appellant intentionally fired two additional shots at SPC JK thereby killing him because appellant “did not want him to suffer;”
(6) Intentional murder—appellant accidentally or negligently shot and wounded SPC JK and then intentionally fired two additional shots at SPC JK thereby killing him because appellant “did not want him to suffer;”
(7) Premeditated murder I—appellant accidentally or negligently shot and wounded SPC JK and then intentionally fired two *737 additional shots at SPC JK with a premeditated design to kill SPC JK thereby killing him because appellant “did not want him to suffer;”
(8) Premeditated murder II—appellant intentionally and with premeditation shot and killed SPC JK to prevent SPC JK from reporting appellant’s larceny.[5]
The military judge’s instructions fully addressed only four of these scenarios. His failure to instruct on accident and the lesser included attempt offenses resulted in the members proceeding to deliberations with incomplete or inaccurate legal guidance concerning half of the factual scenarios actually presented by the evidence. As a result, the members were never required to address the possible effect of the accident defense upon appellant’s culpability, or the implications of Dr. Selove’s testimony concerning the likely rapidity of SPC JK’s death.[6] As our superi- or court noted, “Attempting to infer how court members might have voted if properly instructed is always a risky business; and this case is no exception. We simply are unable to conclude that appellant was not prejudiced here by the instructional omission.” United States v. Rodwell, 20 M.J. 264, 268 (C.M.A.1985). As such, we will grant appropriate relief in our decretal paragraph.
Assignment of error IV[7] is without merit as to the specifications of Charge II (larceny) and the Specification of Additional Charge I (larceny). The remaining assignments of error to include the matters raised personally by appellant pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982), are moot in light of our disposition of the case.
The findings of guilty of the Specification of Charge I and Charge I and the Specification of Additional Charge II and Additional Charge II are set aside. The remaining findings of guilty are affirmed. The sentence is set aside. The same convening authority may order a rehearing on the Specification of Charge I and Charge I and the Specification of Additional Charge II and Additional Charge II and the sentence. If the convening authority determines that a rehearing on those charges is impracticable, he may dismiss the charges and order a rehearing on the sentence only.
Judge MAHER and Judge HOLDEN concur.

 Senior Judge Barto took final action in this case prior to his reassignment.

. Appellant referred to SPC JK as "Crunchy.”

. Doctor Selove also opined that the victim of such a wound could have lived for seconds or minutes before dying. However, such evidence is not dispositive of the issue as to whether a special defense or a lesser included offense is in issue. See Rule for Courts-Martial [hereinafter R.C.M.] 920(e) discussion.

. We are cognizant that we are not bound by appellant's characterization of the incident as an "accident.” See Jenkins, 59 M.J. at 896 n. 7. We will, nevertheless, assume that appellant used the term in its ordinary sense, i.e., "an event or condition occurring by chance or arising from unknown or remote causes ...; lack of intention or necessity ...; an unforeseen unplanned event or condition.” Webster's Third New International Dictionary of the English Language, Unabridged, 1933 (1971 ed.). Moreover, as stated above, the determination as to whether an instruction concerning the special defense of accident should be given is made without regard to the source or credibility of the evidence. R.C.M. 920(e) discussion. As such, we must take appellant’s assertions at face value, and we will do so here.

. In justifying the decision to deny the defense’s request for an instruction on accident, the military judge stated that appellant admitted his conduct was negligent. Even if this was true, such a statement would not necessarily negate the requirement to give the instruction if there was other evidence that the act at issue was non-negligent.

. Inculpatory evidence introduced at trial indicated that appellant stole a bank card belonging to SPC JK, accessed his accounts, and used the card to make purchases in local stores. Specialist JK was aware that someone had used his bank card, and he was reportedly quite angry about it. He began a personal investigation into the identity of the thief, and he made arrangements to view security tapes from stores in which the stolen card was used.

. One could argue that the finding of premeditated and intentional murder by the members foreclosed the applicability of the accident defense and the necessity to instruct on any lesser included offenses. However, our superior court labeled this argument as "legally flawed,” and "rejected speculation as to members’ findings in these circumstances because of the absence of any instructions which would have placed these issues before the members in some form.” United States v. Wells, 52 M.J. 126, 131 (C.A.A.F. 1999) (citing United States v. McGee, 1 M.J. 193, 195 n. 4 (C.M.A.1975); United States v. Wilson, 26 M.J. 10, 14 (C.M.A.1988)). To do otherwise would "undermine the requirement that the judge provide the court members with appropriate legal guidelines prior to their deliberations for it would sanction inappropriate and incomplete instructions through the test-for-prejudice vehicle so long as the accused ultimately was found guilty of an offense which, itself, had been instructed upon properly.” McGee, 1 M.J. at 195 n. 4. In sum, "[gjuilty findings that show an implied rejection of the defense theory do not render harmless, per se, a failure to instruct.” Jenkins, 59 M.J. at 901 (citing Davis, 53 M.J. at 205-06).

. "The [Criminal Investigation Command] violated [appellant’s] fourth amendment rights when they conducted a warrantless search of his room without his consent.”